# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **AUBREY FONTENOT, JR.,** *individually,* | § | |
| *and as administrator of the* **ESTATE OF** | § | |
| **AUBREY FONTENOT, SR.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **(JURY TRIAL DEMANDED)** |
| **V.** | § | |
| | § | |
| **HARRIS COUNTY, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 1, in his** | § | |
| **individual capacity, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 2, in his** | § | |
| **individual capacity, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 3, in his** | § | |
| **individual capacity,** | § | |
| **CONSTABLE MARK HERMAN, in his** | § | |
| **individual capacity,** | § | |
| | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Aubrey Fontenot, Jr., individually and as Administrator of the Estate of Aubrey Fontenot, Sr., (hereinafter "Plaintiff") complaining of Harris County, Unknown Deputy Constable No. 1, in his individual capacity, Unknown Deputy Constable No. 2, in his individual capacity, Unknown Deputy Constable No. 3, in his individual capacity, and Mark Herman, in his individual capacity, and for cause of action would show as follows:

## I.
## INTRODUCTION

1.      This is a civil rights case brought under 42 U.S.C. § 1983 and § 1988 for the deprivation of

1

Aubrey Fontenot, Sr.'s rights under the Fourth and Fourteenth Amendments to the United States Constitution. Decedent Aubrey Fontenot, Sr., was a citizen of the United States. He was born in the year 1955 in Houston, Texas. He lived at the Frontier Inn, located in the 16520 block of the North Freeway, in Room #104. Aubrey Fontenot, Sr., died on August 18, 2022, as a result of being shot unlawfully by a deputy constable acting under color of law within the scope of his employment by the Harris County Constable, Precinct 4.

## II.
## SUBJECT MATTER JURISDICTION AND VENUE

2.      This action arises under 42 U.S.C. § 1983 and § 1988. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Harris County and Defendants are residents of Harris County and, thus, subject to personal jurisdiction of this District.

## III.
## PARTIES AND PERSONAL JURISDICTION

4.      Plaintiff Aubrey Fontenot, Jr. is a 51-year-old male residing in Harris County, Texas.

5.      Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas. At all times relevant to this action, the Harris County Precinct 4 Constable's Office is an agency of Harris County, is part of its law enforcement structure and receives its funding from the Harris County Commissioner's Court. At all times relevant to this action, the Harris County Sheriff's Office is an agency of Harris County and is part of its law enforcement structure, with its deputies and required to follow policies and training standards set by the county.

2

6.      At all times relevant to this action, Defendant Unknown Deputy Constable No. 1 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy Constable No. 1 is being sued in his individual capacity.

7.      At all times relevant to this action, Defendant Unknown Deputy Constable No. 2 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy Constable No. 2 is being sued in his individual capacity.

8.      At all times relevant to this action, Defendant Unknown Deputy Constable No. 3 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy Constable No. 3 is being sued in his individual capacity.

9.      At all times relevant to this action, Defendant Herman was employed as the Constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as the Constable of the Harris County Precinct 4 Constable's Office.  Defendant Herman is being sued in his individual capacity.

## II.
## FACTS

### A. Murdered In Cold Blood

10.      On the morning of August 18, 2022, Aubrey Fontenot, Sr. ("Mr. Fontenot"), was at the

Frontier Inn, located in the 16520 block of the
North Freeway, where he had been staying in
Room #104.



11.     Mr. Fontenot was unarmed when, a little
before 8:30 a.m., Defendant Unknown Deputy
Constable No. 1 discharged twelve rounds from
his firearm into Mr. Fontenot's body in the span
of six seconds, while standing outside Mr.
Fontenot's room and aiming his firearm in a
southeasterly direction into the room at a
defenseless Mr. Fontenot. The distance between
Defendant Unknown Deputy Constable No. 1
and Mr. Fontenot was approximately ten feet.
As he fired the rounds, Defendant Unknown
Deputy Constable No. 1 stood to the left of Mr.
Fontenot's door, in a crouch, with his knees
slightly bent and his back arched forward, with his firearm under his chin as Mr. Fontenot took cover
behind the bed.

12.     Upon information and belief, Defendant Unknown Deputy Constable No. 1 discharged a total
of sixteen rounds from his firearm into Mr. Fontenot's body in the span of eight seconds, while
standing outside Mr. Fontenot's room and aiming his firearm in a southeasterly direction inside the
room at a defenseless Mr. Fontenot.

13.     Upon information and belief, Defendant Unknown Deputy Constable No. 1 was a trainee who lacked the experience and proper training to ascertain that Mr. Fontenot was unarmed and as such, that the use of deadly force was unnecessary.

14.     Mr. Fontenot died a painful death after his body absorbed 16 bullets in eight seconds, or two bullets a second for eight straight seconds, from ten feet away.

15.     As stated, Mr. Fontenot was unarmed. Accordingly, he posed no threat to Defendant Unknown Deputy Constable No. 1 nor any member of the public. As such, Mr. Fontenot's murder at the hands of Defendant Unknown Deputy Constable No. 1 was unjustified, as no reason existed for this Deputy to discharge sixteen rounds from his firearm into Mr. Fontenot in an eight second span at such close range. Accordingly, Defendant Unknown Deputy Constable No. 1's use of force against Mr. Fontenot was completely unwarranted and excessive.

16.     After Unknown Defendant Deputy Constable No. 1 emptied the clip of his firearm into Mr. Fontenot's body in an eight second span, sirens rang out as additional law enforcement vehicles converged on the scene. Twenty-three seconds after discharging his final round, Defendant Unknown Deputy Constable No. 1 removed the empty clip from his weapon and threw it on the ground. Subsequently, Defendant Unknown Deputy Constable No. 2 and Defendant Unknown Deputy Constable No. 3 entered Mr. Fontenot's room and dragged his bullet-ridden, dying, but still warm, body to the sidewalk, handcuffed him and covered him with a sheet. None of the Deputies present checked for any vital signs in Mr. Fontenot or attempted to render him aid.

**B. The Coverup Ensues Immediately**

17.     After the unwarranted use of lethal force by Defendant Unknown Deputy Constable No. 1 resulted in Mr. Fontenot's murder in a span of eight seconds, the Harris County Sheriff's Office

wasted no time in concocting and publishing a self-serving narrative that would exculpate Defendant Unknown Deputy Constable No. 1 from criminal and civil liability for pulling the trigger sixteen times, as well as his supervisors at Harris County Constable Precinct 4.

*i.*     ***The Press Release***

18.     Precinct 4 issued a press release timestamped August 18, 2022, at 8:58 AM entitled: **"Man who pointed gun at Pct. 4 deputies shot to death at north Harris County motel, officials say."** The press release's headline succinctly puts the blame for Mr. Fontenot's murder on Mr. Fontenot by saying he was "shot to death" after "he pointed [a] gun at Pct. 4 deputies." The release quoted Major Wendell "Wayne" Kuhlman of the Harris County Sheriff's Office, who held a press conference at the Frontier Inn at approximately 8:50 a.m. Major Kuhlman repeated the press release's headline, namely, that Mr. Fontenot was "shot to death after pointing a gun at Harris County Precinct 4 deputies." Major Kuhlman further stated that Mr. Fontenot called 911 from the Frontier Inn and said that he had killed his wife and told dispatch he was armed with a knife and a gun.

19.     However, when Mr. Fontenot's wife retrieved his personal effects from the Frontier Inn later that day, a knife and gun were not among them. The reason a knife and gun were not included among Mr. Fontenot's personal effects is because he was never in possession of either of them.

20.     Moreover, the release further quoted Major Kuhlman as saying that when the deputy constables knocked on Mr. Fontenot's door, he "opened the door but shut it real quick," then subsequently came out of the room and pointed a firearm at the responding officers, who then fired at Mr. Fontenot and killed him. However, Mr. Fontenot never came outside, never left his room and never had a gun to point at anyone. On the contrary, Mr. Fontenot was unarmed and inside his room the entire eight seconds it took Defendant Unknown Deputy Constable No. 1 to empty the clip of his

firearm into Mr. Fontenot's body. In addition, the press release conveniently failed to tell the media that Defendant Unknown Deputy Constable No. 1 fired sixteen rounds into Mr. Fontenot in eight seconds. Finally, the press release stated that the Harris County Sheriff's Office was taking over the investigation.

NEWS    WEATHER    KPRC 2+    INVESTIGATES    TRAFFIC    SPORTS    DISCOVER

NEWS    WEATHER    KPRC 2+    INVESTIGATES    TRAFFIC    SPORTS    DISCOVER    HOUSTON

**LOCAL NEWS**

# Man who pointed gun at Pct. 4 deputies shot to death at north Harris County motel, officials say

Amanda Cochran, Digital Special Projects Manager
Brittany Taylor, Senior Digital Content Producer

Published: August 18, 2022 at 8:58 AM
Updated: August 18, 2022 at 3:29 PM

Tags: **North Houston**



*Deputies with the Harris County Constable Precinct 4 were investigating a deadly officer-involved shooting at the Frontier Inn, located in the 16520 block of the North Freeway on Aug. 18, 2022. (Copyright 2022 by KPRC Click2Houston - All rights reserved.)*

f    X    ✉    

**HOUSTON** – A man was killed Thursday morning after pointing a firearm at Harris County Pct. 4 deputies at a north Harris County motel, according to Harris County Maj. Wayne Kuhlman.

8



NEWS        WEATHER        KPRC 2+        INVESTIGATES        TRAFFIC        SPORTS        DISCOVER



*Recommended Videos*



KPRC 2's Gage…

Harris County…

Wanted man shot…

Kuhlman said the caller stated that he killed his wife and told dispatch that he was armed with a knife and a gun. When deputies knocked on the door of the motel room, the suspect reportedly opened the door but shut it real quick. Shortly after slamming the door, officers got into a position for cover.

The suspect allegedly came out of the room, pulled out a firearm and pointed it at the responding officers. Kuhlman said deputies fired at the suspect and he was killed. No deputies were injured in the shooting.

Major Kuhlman said when officers investigated the motel room, there was no victim found inside or at the location. Investigators are looking into if there is a victim or if the suspect had a wife.

The Harris County Sheriff's Office is taking over the investigation.

*ii.    The Original Custodial Death Report*

21.    The Original Custodial Death Report ("Report") documenting Mr. Fontenot's murder was submitted on August 22, 2022 at 3:51 p.m., by Toby Hecker of the Harris County Precinct 4 Constable's Office to the Texas Attorney General. The Report is consistent with Harris County

Constable Precinct 4 and the Harris County Sheriff's Office's attempt to coverup Mr. Fontenot's murder as a justifiable homicide. However, its account of how Mr. Fontenot's death occurred is inconsistent with the explanation given in the press release just minutes after Mr. Fontenot's murder, even though Precinct 4 had ample time to ensure the account given in the Report matched that of the press release.

22.     On Pages 2-3, the Report states that Mr. Fontenot's death was a justifiable homicide and the cause of death was multiple gunshots. However, it does not list the number gunshots or admit that only one deputy constable fired them. On Page5 the Report states that other law enforcement agencies responded to calls for service related to this incident, but does not identify the identity of such agencies. However, the other law enforcement agency that responded to the incident was the Harris County Sheriff's Office. The Report further states on Page 5 that the most serious offenses that the deceased, Mr. Fontenot, would have been charged with at the time of death were homicide and aggravated assault of a peace officer. However, Mr. Fontenot's wife, the person he allegedly killed, recovered his personal effects the same day he was murdered. In addition, as stated, Mr. Fontenot was unarmed and so had no weapon with which to assault a peace officer.

23.     The Report then states that the reason contact was made with Mr. Fontenot by the deputy constables was due to "violent crime against persons" and that Mr. Fontenot "displayed [a] firearm without usage." But as mentioned above, Mr. Fontenot's wife was found alive and unharmed after he was murdered while unarmed. Pages 5-6 of the Report go on to state that Mr. Fontenot "attempted to injure others" and the "others" he attempted to injure were "law enforcement personnel." However, as stated, Mr. Fontenot was not in possession of a weapon. Page 6 of the Report further states that Mr. Fontenot "initiated [the] standoff," "attempted [to] physically assault

[the] officers and "resist[ed] being handcuffed." However, it is unknown how Mr. Fontenot could have put up any resistance to being handcuffed after absorbing sixteen rounds in eight seconds at the hands of Defendant Unknown Deputy Constable No. 1.

24.     In its "Summary of the Incident," the Report states that [w]hen the deputies arrived the deceased answered the door with gun in hand."

25.     This account differs from the press release, which stated "[w]hen deputies knocked on the door of the motel room, the suspect reportedly opened the door but shut it real quick." The press release mentions nothing about Mr. Fontenot "answering the door with gun in hand."

26.     The Report's Summary then states, "[d]eceased [sic] immediately slams the door shut but quickly opens the door again with gun in hand. Deceased [sic] raised his gun at deputies, after being told to drop the gun, deputies discharge their weapon." Again, this account differs from the press release, which said, [s]hortly after slamming the door, officers got into a position for cover. The suspect allegedly came out of the room, pulled out a firearm and pointed it at the responding officers. Kuhlman said deputies fired at the suspect and he was killed. No deputies were injured in the shooting." However, according to the Report's Summary, the incident did not end there. Instead, after the deputies "discharged their weapon," Mr. Fontenot apparently did not die, as the press release indicated. Instead, "[Mr. Fontenot] goes back inside motel room but soon exists again, with gun in hand. Deceased [sic] then quickly moves towards deputies, while pointing a gun at them. 2 deputies discharge their weapon, striking the deceased multiple times."

27.     Beside being materially inconsistent from the account given in the press release, the Report's Summary defies logic, the basic human survival instinct and goes against common sense. Why would Mr. Fontenot, or anyone else for that matter, "raise[] his gun at deputies", "be told to drop the gun"

11

and, after causing them to "discharge their weapon", "go back inside [the] motel room" only to "soon exit[] again, with gun in hand." Why did Mr. Fontenot go back inside the motel room after causing the deputies to shoot their "weapon" at him, only to quickly come back out and move toward them while under fire, pointing a gun at them? If his gun was raised, why wouldn't he just shoot it, instead of going back inside? Did he go inside looking for a different, better, gun with which to fire at them? Did he come back out because he wanted to give them a clearer shot so they could murder him with greater ease, even though he allegedly had a gun? It makes more sense for him to go back inside after being shot at and stay inside for cover, not come back out and point a gun he admittedly never fired.

28.     The Report's Summary emphasizes that Mr. Fontenot interacted with the deputies with "gun in hand" in three different places and also states he "raised [a] gun at deputies" and "point[ed] [a] gun at them." In this regard the Report engages in classic Monday-morning-quarterbacking, namely, it attempts to exculpate Defendant Unknown Deputy Constable No. 1 for his unlawful and unjustified excessive use of force against Mr. Fontenot by saying it was Mr. Fontenot's fault he was killed because he pointed a gun at the deputy constables. However, contrary to the Report's self-serving fabrications, Mr. Fontenot never came outside, never left his room and never had a gun to point at anyone. Instead, Mr. Fontenot was unarmed and inside his room the entire eight seconds it took Defendant Unknown Deputy Constable No. 1 to empty the clip of his firearm into Mr. Fontenot's body.

### iii.     The Harris County Sheriff's Office Refused to Let Plaintiff View His Father's Body

29.     After Mr. Fontenot's murder, Plaintiff wanted to view his father's body and went to the Harris County Morgue. However, when he arrived at the Morgue on Tuesday, August 23, 2022, Plaintiff was turned away by the Harris County Medical Examiner, who told Plaintiff he wasn't authorized to

permit anyone to view Mr. Fontenot's body.

30.     Upon information and belief, the Harris County Sheriff's Office ordered the Harris County Medical Examiner to deny access to the viewing of Mr. Fontenot's body, because it did not want anyone, including Mr. Fontenot's own family, to see the carnage wrought by the sixteen rounds fired by Defendant Unknown Deputy Constable No. 1.

31. Undeterred, Plaintiff again attempted to see his father's body on the following day, Wednesday August 24, 2022, at the funeral home. However, the funeral director told Plaintiff he didn't have the body and that no one could see it until it had after it been embalmed and dressed.

32.     Upon information and belief, the Harris County Sheriff's Office ordered the Funeral Director to deny access to the viewing of Mr. Fontenot's body, because it did not want anyone, including Mr. Fontenot's own family, to see the carnage wrought by the sixteen rounds fired by Defendant Unknown Deputy Constable No. 1.

### COUNT ONE – 42 U.S.C. § 1983
### <u>VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS</u>
#### *Use of Excessive and Deadly Force*
(Defendant Unknown Deputy Constable No. 1, Defendant Unknown Deputy Constable No. 2 and
Defendant Unknown Deputy Constable No. 3)

33.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

34.     Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction

thereof *to the deprivation of any rights, privileges, or immunities secured by the*

*Constitution and laws, shall be liable to the party injured* in an action at law, suit

13

in equity, or other proper proceeding for redress. (Emphasis added). 42 U.S.C.S. §
1983.

35.     The Fourth Amendment, as incorporated and applied to the states through the Fourteenth
Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend. XIV. It is
clearly established that the Fourth Amendment specifically "protects the right to be free from
excessive force during a seizure." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F. 3d 319,
332 (5th Cir. 2020). Moreover, "[a] police officer may not seize an unarmed, nondangerous suspect
by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Deadly force is only a
constitutional option when an "officer has probable cause to believe that the suspect poses a threat
of serious physical harm, either to the officer of others." *Id*. Whether a sufficiently serious threat
exists is a matter of objective reasonableness, not subjective belief, which nonetheless takes into
account the facts and circumstances faced by the individual officer. *Graham v. Connor*, 490 U.S.
386, 396-7 (1989). The reasonableness of the use of deadly force "must be judged from the
perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."
*Id*.

36.     As described in the preceding paragraphs, Defendant Unknown Deputy Constable No. 1,
while acting under color of law and within the scope of his employment, deprived Mr. Fontenot of
his clearly established constitutional rights, including the right to be free from excessive force under
the Fourth and Fourteenth Amendments.

37.     At the time of Mr. Fontenot's murder, Defendant Unknown Deputy Constable No. 1 knew or
should have known that the amount of force he used on Mr. Fontenot, who was unarmed, was clearly

14

excessive and objectively unreasonable in light of the circumstances.

38.     Defendant Unknown Deputy Constable No. 1 unreasonably used excessive force to unlawfully murder Mr. Fontenot, who posed no threat to the Defendant Unknown Deputy Constable No. 1, or anyone else.

39.     Defendant Unknown Deputy Constable No. 1's misconduct, as described in this Complaint, was objectively unreasonable in light of the facts and circumstances known to him at the time and was undertaken intentionally and with willful indifference to Mr. Fontenot's constitutional rights.

40.     As a direct and proximate result of Defendant Unknown Deputy Constable No. 1's misconduct and the violations of Mr. Fontenot's constitutional rights, Defendant Unknown Deputy Constable No. 1 took Mr. Fontenot's liberty and life without due process of law.

41.     Further, Defendant Unknown Deputy Constable No. 2 and Defendant Unknown Deputy Constable No. 3, who were at all times relevant present when Defendant Unknown Deputy Constable No. 1 murdered Mr. Fontenot, knew Defendant Unknown Deputy Constable No. 1 was about to use excessive deadly force against Mr. Fontenot, had the opportunity to stop Defendant Unknown Deputy Constable No. 1, but intentionally failed to intervene.

42.     As a direct and proximate result of Defendant Unknown Deputy Constable No. 2 and Defendant Unknown Deputy Constable No. 3's failure to intervene, Defendant Unknown Deputy Constable No. 1 took Mr. Fontenot's liberty and life without due process of law.

43.     In addition, to the extent Defendant Unknown Deputy Constable No. 2 and Defendant Unknown Deputy Constable No. 3 observed Defendant Unknown Deputy Constable No. 1's conduct, but did not themselves join in shooting Mr. Fontenot, it is clear that Defendant Unknown Deputy Constable No. 1's alleged belief that Mr. Fontenot posed a threat was, in addition to being wrong,

unreasonable; and that not every reasonable deputy constable would have acted in the same manner as Defendant Unknown Deputy Constable No. 1 when presented with the same circumstances.

**COUNT TWO – 42 U.S.C. § 1983**
**MUNICIPAL LIABILITY**
***Constitutional Deprivation through Policy, Liability, Custom or Practice***
(Defendant Harris County)

44.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

45.    Although enacted in 1871, Section 1983 was not applied to governmental units until 1978 when the U. S. Supreme Court reexamined the legislative history and concluded that "municipalities and other local governmental units" are "persons" within the meaning of Section 1983. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

46.    *Monell* requires a plaintiff to show that their injuries resulted from a governmental "policy or custom." 436 U.S. at 694. *Monell* defines "policy" as "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. *Monell* defines "custom" as a "persistent and widespread" practice even though it has not been officially adopted. 436 U.S. at 691. The U.S. Supreme Court has also made it clear that: "good faith" is not a defense to claims under Section 1983, *see Owen v. City of Independence, Missouri*, 445 U.S. 622, 638, *rehearing denied*, 446 U.S. 993 (1980), and that the states' sovereign immunity is not a defense, *see Daniels v. Williams*, 474 U.S. 327 (1986).

47.    It is also clear that a county is liable under Section 1983 for civil rights violations resulting from the actions of a county official who had final policy making authority. *See Pembaur v.City of Cincinnati*, 475 U.S. 469 (1986). Moreover, the U.S. Supreme Court has also held that a municipality could be liable under Section 1983 for constitutional violations resulting from its failure to properly train police officers if "[t]he need for more or different training is so obvious,

16

and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)

48.     Defendant Harris County knowingly failed to maintain policies, practices and training that met the minimum standards in the industry.

49.     At all times relevant to this action, Defendant Harris County has maintained policies, customs and/or practices that caused and were the moving force behind the violation of Mr. Fontenot's constitutional rights, as described in this Complaint.

50.     The acts and/or omissions of each Individual Defendant were caused by said policies, customs or practices.

51.     Said policies, customs and practices include the following:

a. Defendant Harris County's policy or custom of failing to properly train its deputy constables regarding what constitutes probable cause warranting the use of deadly force;

b. Defendant Harris County's policy or custom of allowing deputy constables and deputy sheriffs to mispresent facts in a criminal investigation for personal gain;

c. Defendant Harris County's policy of custom of allowing deputy constables to violate policies related to criminal investigations and collection/reporting of evidence;

d. Defendant Harris County's policy or custom of allowing deputy constables to engage in in race-based policing, specifically by disproportionately targeting black people with the use of unwarranted deadly force;

e. Defendant Harris County's written policies that encourage deputy constables and deputy sheriffs to manipulate investigations and the presentation of evidence after using

17

unwarranted deadly force to exculpate its officers from criminal and civil liability.

52.     Harris County, through its policymakers, including Defendant Herman, had actual or constructive knowledge about and was deliberately indifferent to, all of the policies, customs and practices of the Harris County Precinct 4 Constable's Office and the Harris County Sheriff's referenced in this Complaint. All such policies, customs and practices were the moving force behind, and cause of, the deprivation of Mr. Fontenot's constitutional rights and Plaintiff's resulting damages. The conduct of each Individual Defendant as described in this Complaint was caused by said policies, customs and practices.

53.     As a direct and proximate result of Defendants' misconduct and the violations of Mr. Fontenot's constitutional rights, Defendant Unknown Deputy Constable No. 1 took Mr. Fontenot's liberty and life without due process of law.

### COUNT THREE – 42 U.S.C. § 1983
### SUPERVISOR LIABILITY
### *Failure to Adequately Train and Supervise*
(Defendant Herman)

54.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

55.      In order to establish supervisor liability for constitutional violations committed by subordinate employees, a Plaintiff must show, as relevant here, that the supervising personnel was "personally involved" in the alleged constitutional violations. *Turner v. Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017); *Peha v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

56.     To show personal involvement, the supervisor must know about the violation and personally direct the violation, facilitate it, approve it, condone it, turn a blind eye to it for fear of what he might see, or acquiesce in its continuance. *Turner*, 848 F.3d at 696 & n.88 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jenkins v. Wood*, 81 F.3d 988,

18

995 (10th Cir. 1996)).

57.     Defendant Herman implemented and/or failed to implement the aforementioned policies, training, and supervision, which were the moving force that caused Mr. Fontenot's constitutional injuries.

58.     As a direct and proximate result of the Defendant Herman's conduct, Defendant Unknown Deputy Constable No. 1 took Mr. Fontenot's liberty and life without due process of law.


**COUNT FOUR – TEXAS WRONGFUL DEATH AND SURVIVIAL ACTION**

59.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

60.     Plaintiff files this his wrongful death and survival action against Defendants pursuant to the Texas Wrongful Death Statute and Texas Survivorship Statute and asserts that Mr. Fontenot's death was the result of Defendants' acts and omissions.

**DAMAGES**

61.     Plaintiff seeks all damages allowed by law as a result of the aforementioned conduct forming the basis for each of his claims. Plaintiff requests damages within the jurisdictional limits of the Court.

62.     Upon the trial of this cause, it will be shown that Mr. Fontenot sustained serious, permanent injuries, and ultimately death, and Plaintiff incurred serious damages.

63.     The damages sustained by Mr. Fontenot and the Plaintiff were proximately caused by the Defendants as set forth herein.

64.     Plaintiff respectfully requests the Court and a Jury to determine the amount of losses Mr. Fontenot and the Plaintiff have incurred in the past and will incur in the future.

65.     Certain damages elements are provided by law to which the Plaintiff is entitled to have the Jury separately consider in this case to determine the sum of money that will fairly and reasonably compensate the Plaintiff.

66.     Plaintiff is further entitled to reasonable attorneys' fees and costs in pursuing this matter, and any other reasonable and necessary damages as allowed by 42 U.S.C. 1988.

## SPOILATION INSTRUCTION

67.     Plaintiff has requested and demanded that Defendants preserve and maintain all evidence pertaining to any claim of defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom.

68.     Failure to maintain such items shall constitute a "spoliation" of the evidence.

## REQUEST FOR RELIEF

69.     Plaintiff seeks judgment in his favor and against the Defendants, jointly and severally, ordering them to pay all damages recoverable under the law, including the following:

Compensatory damages;

Loss of enjoyment of life;

Emotional pain;

Physical pain and suffering;

Physical impairment;

Mental anguish;

Loss of the society, association and companionship of family;

Loss of the parent child relationship;

Deprivation of legal rights;

Loss of earning capacity;

Disfigurement;

Death;

Punitive damages;

Pre-judgment interest;

Post-judgment interest;

Costs of suit and fees as allowable by law;

Attorneys' fees under 42 U.S.C. § 1988;

Expert fees under 42 U.S.C. § 1988, and

Any other relief as is deemed just and proper.

## JURY TRIAL

70.     Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER

71.     WHEREFORE, Plaintiff respectfully prays that Defendants be summoned to appear and answer herein, and that upon a final hearing of this cause, that judgment be entered for the Plaintiff and against Defendants for all damages requested herein, together with pre-judgment and post-judgment interest at the maximum rate allowed by law, attorneys' fees, costs of court and such other and further relief to which Plaintiffs may justly entitled at law or in equity.

Respectfully submitted,

By:     _/s/ Issa Paul Tannous_
**ISSA PAUL TANNOUS**
Texas Bar No. 24048829
Federal Id. No.: 3621802
4900 Fournace Place, Suite 520

21

Bellaire, Texas 77401
Tel. (713) 485-5901
Fax. (832) 201-9145
issa@iptannouslaw.com
**ATTORNEY FOR PLAINTIFF**