# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **AUBREY FONTENOT, JR.,** *individually,* | § | |
| *and as administrator of the* **ESTATE OF** | § | |
| **AUBREY FONTENOT, SR.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **(JURY TRIAL DEMANDED)** |
| **V.** | § | |
| | § | |
| **HARRIS COUNTY, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 1, in his** | § | |
| **individual capacity, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 2, in his** | § | |
| **individual capacity, UNKNOWN** | § | |
| **DEPUTY CONSTABLE NO. 3, in his** | § | |
| **individual capacity,** | § | |
| **CONSTABLE MARK HERMAN, in his** | § | |
| **individual capacity,** | § | |
| | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFF'S FIRST ORIGINAL AMENDED COMPLAINT

COMES NOW Plaintiff Aubrey Fontenot, Jr., individually and as Administrator of the Estate

of Aubrey Fontenot, Sr., (hereinafter "Plaintiff") complaining of Harris County, Unknown Deputy

No. 1, in his individual capacity, Unknown Deputy No. 2, in his individual capacity, Unknown

Deputy No. 3, in his individual capacity, and Mark Herman, in his individual capacity, and for cause

of action would show as follows:

## I.
## INTRODUCTION

1.      This is a civil rights case brought under 42 U.S.C. § 1983 and § 1988 for the deprivation of

Aubrey Fontenot, Sr.'s rights under the Fourth and Fourteenth Amendments to the United States Constitution. Decedent Aubrey Fontenot, Sr., was a citizen of the United States. He was born in the year 1955 in Houston, Texas. He lived at the Frontier Inn, located in the 16520 block of the North Freeway, in Room #104. Aubrey Fontenot, Sr., died on August 18, 2022, as a result of being shot unlawfully by a deputy constable acting under color of law within the scope of his employment by the Harris County Constable, Precinct 4.

## II.
## SUBJECT MATTER JURISDICTION AND VENUE

2. This action arises under 42 U.S.C. § 1983 and § 1988. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Harris County and Defendants are residents of Harris County and, thus, subject to personal jurisdiction of this District.

## III.
## PARTIES AND PERSONAL JURISDICTION

4. Plaintiff Aubrey Fontenot, Jr. is a 51-year-old male residing in Harris County, Texas.

5. Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas. At all times relevant to this action, the Harris County Precinct 4 Constable's Office is an agency of Harris County, is part of its law enforcement structure and receives its funding from the Harris County Commissioner's Court. At all times relevant to this action, the Harris County Sheriff's Office is an agency of Harris County and is part of its law enforcement structure, with its deputies and required to follow policies and training standards set by the county.

6.      At all times relevant to this action, Defendant Unknown Deputy No. 1 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy No. 1 is being sued in his individual capacity.

7.      At all times relevant to this action, Defendant Unknown Deputy No. 2 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy No. 2 is being sued in his individual capacity.

8.      At all times relevant to this action, Defendant Unknown Deputy No. 3 was employed as a deputy constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as a deputy constable of the Harris County Precinct 4 Constable's Office. Unknown Deputy Constable No. 3 is being sued in his individual capacity.

9.      At all times relevant to this action, Defendant Herman was employed as the Constable of the Harris County Precinct 4 Constable's Office. All of his actions and/or inactions were taken under color of state law and within his employment as the Constable of the Harris County Precinct 4 Constable's Office.  Defendant Herman is being sued in his individual capacity.

**II.**
**FACTS**

**A. Murdered In Cold Blood**

10.      On the morning of August 18, 2022, Aubrey Fontenot, Sr. ("Mr. Fontenot"), was at the

3

Frontier Inn, located in the 16520 block of the North Freeway, where he had been staying in Room #104.

11.     Mr. Fontenot was unarmed when, a little before 8:30 a.m., Defendant Unknown Deputy No. 1 discharged twelve rounds from his firearm into Mr. Fontenot's body in the span of six seconds, while standing outside Mr. Fontenot's room and aiming his firearm in a southeasterly direction into the room at a defenseless Mr. Fontenot. The distance between Defendant Unknown Deputy No. 1 and Mr. Fontenot was approximately ten feet. As he fired the rounds, Defendant Unknown Deputy No. 1 stood to the left of Mr. Fontenot's door, in a crouch, with his knees slightly bent and his back arched forward, with his firearm under his chin as Mr. Fontenot took cover behind the bed.



12.     Upon information and belief, Defendant Unknown Deputy No. 1 discharged a total of sixteen rounds from his firearm into Mr. Fontenot's body in the span of eight seconds, while standing outside Mr. Fontenot's room and aiming his firearm in a southeasterly direction inside the room at a defenseless Mr. Fontenot.

13.     Upon information and belief, Defendant Unknown Deputy No. 1 was a trainee who lacked

the experience and proper training to ascertain that Mr. Fontenot was unarmed and as such, that the use of deadly force was unnecessary.

14.     Mr. Fontenot died a painful death after his body absorbed 16 bullets in eight seconds, or two bullets a second for eight straight seconds, from ten feet away.

15.     As stated, Mr. Fontenot was unarmed. Accordingly, he posed no threat to Defendant Unknown Deputy No. 1 nor any member of the public. As such, Mr. Fontenot's murder at the hands of Defendant Unknown Deputy No. 1 was unjustified, as no reason existed for this Deputy to discharge sixteen rounds from his firearm into Mr. Fontenot in an eight second span at such close range. Accordingly, Defendant Unknown Deputy No. 1's use of force against Mr. Fontenot was completely unwarranted and excessive.

16.     After Unknown Defendant Deputy No. 1 emptied the clip of his firearm into Mr. Fontenot's body in an eight second span, sirens rang out as additional law enforcement vehicles converged on the scene. Twenty-three seconds after discharging his final round, Defendant Unknown Deputy No. 1 removed the empty clip from his weapon and threw it on the ground. Subsequently, Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3 entered Mr. Fontenot's room and dragged his bullet-ridden, dying, but still warm, body to the sidewalk, handcuffed him and covered him with a sheet. None of the Deputies present checked for any vital signs in Mr. Fontenot or attempted to render him aid.

**B. The Coverup Ensues Immediately**

17.     After the unwarranted use of lethal force by Defendant Unknown Deputy No. 1 resulted in Mr. Fontenot's murder in a span of eight seconds, the Harris County Sheriff's Office wasted no time in concocting and publishing a self-serving narrative that would exculpate Defendant Unknown

Deputy No. 1 from criminal and civil liability for pulling the trigger sixteen times, as well as his supervisors at Harris County Constable Precinct 4.

*i.*     ***The Press Release***

18.     Precinct 4 issued a press release timestamped August 18, 2022, at 8:58 AM entitled: **"Man who pointed gun at Pct. 4 deputies shot to death at north Harris County motel, officials say."** The press release's headline succinctly puts the blame for Mr. Fontenot's murder on Mr. Fontenot by saying he was "shot to death" after "he pointed [a] gun at Pct. 4 deputies." The release quoted Major Wendell "Wayne" Kuhlman of the Harris County Sheriff's Office, who held a press conference at the Frontier Inn at approximately 8:50 a.m. Major Kuhlman repeated the press release's headline, namely, that Mr. Fontenot was "shot to death after pointing a gun at Harris County Precinct 4 deputies." Major Kuhlman further stated that Mr. Fontenot called 911 from the Frontier Inn and said that he had killed his wife and told dispatch he was armed with a knife and a gun.

19.     However, when Mr. Fontenot's wife retrieved his personal effects from the Frontier Inn later that day, a knife and gun were not among them. The reason a knife and gun were not included among Mr. Fontenot's personal effects is because he was never in possession of either of them.

20.     Moreover, the release further quoted Major Kuhlman as saying that when the deputy constables knocked on Mr. Fontenot's door, he "opened the door but shut it real quick," then subsequently came out of the room and pointed a firearm at the responding officers, who then fired at Mr. Fontenot and killed him. However, Mr. Fontenot never came outside, never left his room and never had a gun to point at anyone. On the contrary, Mr. Fontenot was unarmed and inside his room the entire eight seconds it took Defendant Unknown Deputy No. 1 to empty the clip of his firearm into Mr. Fontenot's body. In addition, the press release conveniently failed to tell the media that

Defendant Unknown Deputy No. 1 fired sixteen rounds into Mr. Fontenot in eight seconds. Finally, the press release stated that the Harris County Sheriff's Office was taking over the investigation.



NEWS   WEATHER   KPRC 2+   INVESTIGATES   TRAFFIC   SPORTS   DISCOVER

NEWS   WEATHER   KPRC 2+   INVESTIGATES   TRAFFIC   SPORTS   DISCOVER   HOUSTON

**LOCAL NEWS**

## Man who pointed gun at Pct. 4 deputies shot to death at north Harris County motel, officials say

Amanda Cochran, Digital Special Projects Manager
Brittany Taylor, Senior Digital Content Producer

Published: August 18, 2022 at 8:58 AM
Updated: August 18, 2022 at 3:29 PM

Tags: **North Houston**

Deputies with the Harris County Constable Precinct 4 were investigating a deadly officer-involved shooting at the Frontier Inn, located in the 16520 block of the North Freeway on Aug. 18, 2022. (Copyright 2022 by KPRC Click2Houston - All rights reserved.)



**HOUSTON** – A man was killed Thursday morning after pointing a firearm at Harris County Pct. 4 deputies at a north Harris County motel, according to Harris County Maj. Wayne Kuhlman.



Recommended Videos



KPRC 2's Gage...

Harris County...

Wanted man shot...

Kuhlman said the caller stated that he killed his wife and told dispatch that he was armed with a knife and a gun. When deputies knocked on the door of the motel room, the suspect reportedly opened the door but shut it real quick. Shortly after slamming the door, officers got into a position for cover.

The suspect allegedly came out of the room, pulled out a firearm and pointed it at the responding officers. Kuhlman said deputies fired at the suspect and he was killed. No deputies were injured in the shooting.

Major Kuhlman said when officers investigated the motel room, there was no victim found inside or at the location. Investigators are looking into if there is a victim or if the suspect had a wife.

The Harris County Sheriff's Office is taking over the investigation.

### ii. *The Original Custodial Death Report*

21.     The Original Custodial Death Report ("Report") documenting Mr. Fontenot's murder was submitted on August 22, 2022 at 3:51 p.m., by Toby Hecker of the Harris County Precinct 4 Constable's Office to the Texas Attorney General. The Report is consistent with Harris County

Constable Precinct 4 and the Harris County Sheriff's Office's attempt to coverup Mr. Fontenot's murder as a justifiable homicide. However, its account of how Mr. Fontenot's death occurred is inconsistent with the explanation given in the press release just minutes after Mr. Fontenot's murder, even though Precinct 4 had ample time to ensure the account given in the Report matched that of the press release.

22.     On Pages 2-3, the Report states that Mr. Fontenot's death was a justifiable homicide and the cause of death was multiple gunshots. However, it does not list the number gunshots or admit that only one deputy constable fired them. On Page5 the Report states that other law enforcement agencies responded to calls for service related to this incident, but does not identify the identity of such agencies. However, the other law enforcement agency that responded to the incident was the Harris County Sheriff's Office. The Report further states on Page 5 that the most serious offenses that the deceased, Mr. Fontenot, would have been charged with at the time of death were homicide and aggravated assault of a peace officer. However, Mr. Fontenot's wife, the person he allegedly killed, recovered his personal effects the same day he was murdered. In addition, as stated, Mr. Fontenot was unarmed and so had no weapon with which to assault a peace officer.

23.     The Report then states that the reason contact was made with Mr. Fontenot by the deputy constables was due to "violent crime against persons" and that Mr. Fontenot "displayed [a] firearm without usage." But as mentioned above, Mr. Fontenot's wife was found alive and unharmed after he was murdered while unarmed. Pages 5-6 of the Report go on to state that Mr. Fontenot "attempted to injure others" and the "others" he attempted to injure were "law enforcement personnel." However, as stated, Mr. Fontenot was not in possession of a weapon. Page 6 of the Report further states that Mr. Fontenot "initiated [the] standoff," "attempted [to] physically assault

[the] officers and "resist[ed] being handcuffed." However, it is unknown how Mr. Fontenot could have put up any resistance to being handcuffed after absorbing sixteen rounds in eight seconds at the hands of Defendant Unknown Deputy No. 1.

24.     In its "Summary of the Incident," the Report states that [w]hen the deputies arrived the deceased answered the door with gun in hand."

25.     This account differs from the press release, which stated "[w]hen deputies knocked on the door of the motel room, the suspect reportedly opened the door but shut it real quick." The press release mentions nothing about Mr. Fontenot "answering the door with gun in hand."

26.     The Report's Summary then states, "[d]eceased [sic] immediately slams the door shut but quickly opens the door again with gun in hand. Deceased [sic] raised his gun at deputies, after being told to drop the gun, deputies discharge their weapon." Again, this account differs from the press release, which said, [s]hortly after slamming the door, officers got into a position for cover. The suspect allegedly came out of the room, pulled out a firearm and pointed it at the responding officers. Kuhlman said deputies fired at the suspect and he was killed. No deputies were injured in the shooting." However, according to the Report's Summary, the incident did not end there. Instead, after the deputies "discharged their weapon," Mr. Fontenot apparently did not die, as the press release indicated. Instead, "[Mr. Fontenot] goes back inside motel room but soon exists again, with gun in hand. Deceased [sic] then quickly moves towards deputies, while pointing a gun at them. 2 deputies discharge their weapon, striking the deceased multiple times."

27.     Beside being materially inconsistent from the account given in the press release, the Report's Summary defies logic, the basic human survival instinct and goes against common sense. Why would Mr. Fontenot, or anyone else for that matter, "raise[] his gun at deputies", "be told to drop the gun"

and, after causing them to "discharge their weapon", "go back inside [the] motel room" only to "soon exit[] again, with gun in hand." Why did Mr. Fontenot go back inside the motel room after causing the deputies to shoot their "weapon" at him, only to quickly come back out and move toward them while under fire, pointing a gun at them? If his gun was raised, why wouldn't he just shoot it, instead of going back inside? Did he go inside looking for a different, better, gun with which to fire at them? Did he come back out because he wanted to give them a clearer shot so they could murder him with greater ease, even though he allegedly had a gun? It makes more sense for him to go back inside after being shot at and stay inside for cover, not come back out and point a gun he admittedly never fired.

28.     The Report's Summary emphasizes that Mr. Fontenot interacted with the deputies with "gun in hand" in three different places and also states he "raised [a] gun at deputies" and "point[ed] [a] gun at them." In this regard the Report engages in classic Monday-morning-quarterbacking, namely, it attempts to exculpate Defendant Unknown Deputy No. 1 for his unlawful and unjustified excessive use of force against Mr. Fontenot by saying it was Mr. Fontenot's fault he was killed because he pointed a gun at the deputy constables. However, contrary to the Report's self-serving fabrications, Mr. Fontenot never came outside, never left his room and never had a gun to point at anyone. Instead, Mr. Fontenot was unarmed and inside his room the entire eight seconds it took Defendant Unknown Deputy No. 1 to empty the clip of his firearm into Mr. Fontenot's body.

### iii.     The Harris County Sheriff's Office Refused to Let Plaintiff View His Father's Body

29.     After Mr. Fontenot's murder, Plaintiff wanted to view his father's body and went to the Harris County Morgue. However, when he arrived at the Morgue on Tuesday, August 23, 2022, Plaintiff was turned away by the Harris County Medical Examiner, who told Plaintiff he wasn't authorized to permit anyone to view Mr. Fontenot's body.

30.     Upon information and belief, the Harris County Sheriff's Office ordered the Harris County Medical Examiner to deny access to the viewing of Mr. Fontenot's body, because it did not want anyone, including Mr. Fontenot's own family, to see the carnage wrought by the sixteen rounds fired by Defendant Unknown Deputy No. 1.

31. Undeterred, Plaintiff again attempted to see his father's body on the following day, Wednesday August 24, 2022, at the funeral home. However, the funeral director told Plaintiff he didn't have the body and that no one could see it until it had after it been embalmed and dressed.

32.     Upon information and belief, the Harris County Sheriff's Office ordered the Funeral Director to deny access to the viewing of Mr. Fontenot's body, because it did not want anyone, including Mr. Fontenot's own family, to see the carnage wrought by the sixteen rounds fired by Defendant Unknown Deputy No. 1.

### iv. Harris County's Policy of Abiding Instances of Excessive Force by its Constables and Deputy Constables

33.     Harris County Constables have a long and documented history of abiding instances of excessive force in a wide variety of circumstances, both in that deputy constables routinely use more force than is necessary in a given situation, and in that the Constables will keep evidence and investigations out of the public eye, and let offending deputy constables continue to serve with no professional consequences. The latter custom of turning a blind eye to excessive force emboldens deputy constables to use any amount of force with prejudice, and without fear of professional consequences. Plaintiff offers the following numerous examples, spanning decades of uses of excessive force that have gone almost completely unpunished and unaddressed by the Harris County Constables, to illustrate just how pervasive and long-standing this culture and pattern of excessive

force is among Harris County's Constables.

34.     On September 30, 2010, Harris County Precinct Four Deputy Kevin Vailes placed his boot across Jamail Joseph Amron's nostrils and mouth and pressed down with enough force so that the arch of his neck was flat along with asphalt of a Burger King parking lot. Deputy Vailes maintained his boot pressed against Jamail's face for approximately five minutes. Fifteen minutes later Jamail was dead.

35.     Nobody was disciplined, indicating ratification and acceptance of the Harris County Constables' patterns, practices, customs and/or procedures of the excessive force.

36.     On October 20, 2019, Larry Mukes died in the custody of Harris County Precinct Four deputies at 20007 Big Timber Drive in Huble, Texas. The deputies reported that Mr. Mukes grabbed two handguns from inside a car and pointed them at the deputies, then put one of the guns to his head and shot himself. The deputies accordingly reported that Mr. Mukes died by suicide. However, the circumstances surrounding his death remain suspicious.

37.     Upon information and belief, no discipline occurred.

38.     On July 7, 2020, Paul Williams, an Iraq war veteran who suffered from PTSD and mental illness, died in his apartment located in the 13800 block of Ella Boulevard after Harris County Precinct Four deputies responded to a disturbance between Mr. Williams and his brother. Excessive force was used by the deputies when they shot Mr. Williams.

39.     Nobody was disciplined, indicating ratification and acceptance of the Harris County Constables' patterns, practices, customs and/or procedures of the excessive force.

40.     On July 9, 2014, Harris County Precinct Four Deputy Francisco J. Ruiz used excessive deadly force by shooting Charles Kevin Goodridge in the parking lot of the Village in the Woods apartments

on 11800 Grant Road in Cypress, Texas. Mr. Goodridge died later that night in Ben Taub Hospital.

41.     Nobody was disciplined, indicating ratification and acceptance of the Harris County Constables' patterns, practices, customs and/or procedures of the excessive force.

42.     On March 12, 2023, Marvin Dewayne Hurst died in the custody of Harris County Precinct Four Deputies at 8100 Renmark Lane in Houston, Texas, under suspicious circumstances.

43.     Upon information and belief, no discipline occurred.

44.     On January 26, 2004, Precinct 1 deputy constables shot and killed Tairon Gray, a 23-year old Houston man with a history of mental illness, outside his apartment at the Aberdeen complex in the 3400 block of Woodchase. Gray was shot 10 or 11 times.

45.     Nobody was disciplined, indicating ratification and acceptance of the Harris County Constables' patterns, practices, customs and/or procedures of the excessive force.

46.     On August 20, 2016, Precinct 1 deputy constables restrained, physically subdued and handcuffed Willie Lee Washington, a 37 year-old man with a history of mental illness, outside a residence located at 5630 Fariview Forest Drive. Emergency Medical Services ("EMS") were also called to the residence. However, instead of allowing EMS to transport Mr. Washington to the hospital immediately, the deputies delayed EMS's departure for fifteen minutes. When Mr. Washington arrived at Willobrook Methodist Hospital, his heart was still beating, but precious time to save his life was lost. He died later that night.

47.     Upon information and belief, nobody was disciplined.

48.     All of the foregoing instances involved detainees and all involved excessive force conduct, like that used against Mr. Fontenot, but none were disciplined.

49.     The foregoing establishes a clear practice indicating ratification and acceptance of the Harris

County Constables' patterns, practices, customs and/or procedures of the excessive force used regularly and often by its Deputies.

50.    This practice, though unwritten, is so widespread and such a ubiquitous custom that it rises to have the force of law as a policy.

51.    This policy has been promulgated by policymakers and decision makers of Harris County, including the Harris County Commissioner's Court and the Harris County Constables.1

52.    The Harris County Constables promulgated this policy of excessive force that is and was widespread in Harris County indicating ratification and acceptance of the Constables patterns, practices, customs and/or procedures of the excessive force.

53.    Mr. Fontenot paid with his life as a direct result of Harris County Commissioner's Court and the Harris County Constables' patterns, practices, customs and/or procedures of excessive force and emboldened Deputy Constables to use excessive force without fear of being disciplined.

54.    This policy has been adopted with deliberate indifference by these policymakers.

55.    These incidents are sadly commonplace. For example, in the past seven years, more than thirty people have died while in custody of Harris County Deputy Constables.

56.    All of this was well known to the Defendant Unknown Deputies and the Defendant Harris County.

57.    Defendant Deputies knew that Deputies are almost never disciplined for excessive force.

58.    These incidents, their ubiquity, gave rise to a widespread practice so persistent and pervasive

---

1 Constables are county officers. Tex. Const. art. 16, § 61; Tex. Const. art. 5, § 24. Under Tex. Loc. Gov't Code Ann. § 152.001, constables are county officers. Tex. Loc. Gov't Code Ann. § 87.012(12) provides that county officers may be paid from county general fund or from other funds available for that purpose.

as to have the force of law.

**COUNT ONE – 42 U.S.C. § 1983**
**VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS**
***Use of Excessive and Deadly Force***
(Defendant Unknown Deputy No. 1, Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3)

59.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

60.    Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress. (Emphasis added). 42 U.S.C.S. § 1983.

61.    The Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend. XIV. It is clearly established that the Fourth Amendment specifically "protects the right to be free from excessive force during a seizure." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F. 3d 319, 332 (5th Cir. 2020). Moreover, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Deadly force is only a constitutional option when an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer of others." *Id*. Whether a sufficiently serious threat

16

exists is a matter of objective reasonableness, not subjective belief, which nonetheless takes into account the facts and circumstances faced by the individual officer. *Graham v. Connor*, 490 U.S. 386, 396-7 (1989). The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

62.     As described in the preceding paragraphs, Defendant Unknown Deputy No. 1, while acting under color of law and within the scope of his employment, deprived Mr. Fontenot of his clearly established constitutional rights, including the right to be free from excessive force under the Fourth and Fourteenth Amendments.

63.     At the time of Mr. Fontenot's murder, Defendant Unknown Deputy No. 1 knew or should have known that the amount of force he used on Mr. Fontenot, who was unarmed, was clearly excessive and objectively unreasonable in light of the circumstances.

64.     Defendant Unknown Deputy No. 1 unreasonably used excessive force to unlawfully murder Mr. Fontenot, who posed no threat to the Defendant Unknown Deputy No. 1, or anyone else.

65.     Defendant Unknown Deputy No. 1's misconduct, as described in this Complaint, was objectively unreasonable in light of the facts and circumstances known to him at the time and was undertaken unlawfully with respect to Mr. Fontenot's constitutional rights.

66.     As a direct and proximate result of Defendant Unknown Deputy No. 1's misconduct and the violations of Mr. Fontenot's constitutional rights, Defendant Unknown Deputy No. 1 took Mr. Fontenot's liberty and life without due process of law.

67.     Further, Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3, who were at all times relevant present when Defendant Unknown Deputy No. 1 murdered Mr. Fontenot,

knew Defendant Unknown Deputy No. 1 was about to use excessive deadly force against Mr. Fontenot, had the opportunity to stop Defendant Unknown Deputy No. 1, but intentionally failed to intervene.

68.     As a direct and proximate result of Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3's failure to intervene, Defendant Unknown Deputy No. 1 took Mr. Fontenot's liberty and life without due process of law.

69.     In addition, to the extent Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3 observed Defendant Unknown Deputy No. 1's conduct, but did not themselves join in shooting Mr. Fontenot, it is clear that Defendant Unknown Deputy No. 1's alleged belief that Mr. Fontenot posed a threat was, in addition to being wrong, unreasonable; and that not every reasonable deputy constable would have acted in the same manner as Defendant Unknown Deputy No. 1 when presented with the same circumstances.

**COUNT TWO – 42 U.S.C. § 1983**
**<u>MUNICIPAL LIABILITY</u>**
***Constitutional Deprivation through Policy, Liability, Custom or Practice***
(Defendant Harris County)

70.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

71.     Although enacted in 1871, Section 1983 was not applied to governmental units until 1978 when the U. S. Supreme Court reexamined the legislative history and concluded that "municipalities and other local governmental units" are "persons" within the meaning of Section 1983. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). The Supreme Court held in *Monell* that a local government is liable under Section 1983, for its policies that cause constitutional torts. *Monell*, 436 U.S. at 694. For liability to attach, a local government must itself subject a person to a deprivation of rights or cause a person to be subjected

18

to such a deprivation through official action or imprimatur. *See Connick v. Thompson*, 653 U.S. 51, 60-61 (2011); *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

72.     To establish local government liability under Section 1983, a claimant must prove three elements: an official policy, promulgated by the local government unit's policy maker, that was the "moving force" behind the violation. *See Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (citing *Monell*, 436 U.S. at 694). These three principles are "necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

73.     An official government policy can be proven in more than one way. It includes: (1) official decisions promulgated by a local government's lawmaking body; (2) longstanding practices so persistent and widespread as to fairly represent government policy or the force of law; and (3) the acts or policies of officials who by law or delegation possess final policymaking authority for the local government concerning the action alleged to have caused the particular constitutional or statutory violation at issue. *See Pembaur*, 475 U.S. at 480-81

74.     Moreover, the U.S. Supreme Court has also held that a municipality could be liable under Section 1983 for constitutional violations resulting from its failure to properly train police officers if "[t]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

75.     Defendant Harris County and the Constables it funds have a policy of using excessive

force; this is clear from Defendant Unknown Deputy No. 1 discharging sixteen rounds into Mr. Fontenot when he was unarmed and Defendant Unknown Deputy No. 2 and Defendant Unknown Deputy No. 3's reaction to the shooting; they failed to render any aid to Mr. Fontenot and watched him die. Defendant Harris County may not have a written policy authorizing excessive use of force, but it is apparent that all the foregoing were standard operating procedures for the Defendants. By tacitly approving of these violations and by its proclivity to "turning a blind eye," so to speak, to gross violations of clearly established constitutional rights, Defendant Harris County created a policy of brutality and excessive force. This practice is so pervasive as to have the force of law.

76.     This policy of brutality and excessive force demonstrates a conscious indifference to the clear established constitutional rights secured to any person under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. The foregoing policies were the producing and proximate causes of Plaintiff's injuries.

77.     Excessive force is so pervasive and widespread among Harris County Constable Deputies that it had the force of law as an unwritten policy and custom. The incidents outlined in the above paragraphs establish this. And while every incident was not perfectly similar to that suffered by Mr. Fontenot, they all went to establishing the culture and policy in which Defendant Unknown Deputies acted with impunity to unnecessarily murder Mr. Fontenot by the use of excessive force.

78.     This policy was promulgated by policy makers up to and including Harris County Precinct Four Constable Mark Herman, who had the authority to establish county policy as to the deputies in his precinct.

79.     And this policy was the moving force behind the Defendant Unknown Deputies' actions. Without this policy, they would not have behaved the way they did. This policy, of engaging in and

tolerating excessive force and brutality, proximately caused the incident.

80. Deliberate indifference to Mr. Fontenot's rights were shown. This has been shown by the numerous previous incidents, and that no discipline has been administered to the offending deputies. Tacit approval has occurred, and an inference may be made that such activities were in accordance with unwritten policy and custom.

**i.** ***Although Harris County Constables Are Funded by Harris County, a Legal Loophole Allows Constables to Enjoy Immunity When their Deputies Violate Harris County Citizens' Constitutional Rights***

81. No Texas state court has ever held that a constable in a single precinct is the *county's* final policymaker for law enforcement. State and federal courts construing Texas law have long held that the sheriff is a county's final policymaker as to law enforcement for purposes of county liability under Section 1983. *Harris Cnty. v. Coats*, 607 S.W.3d 359, 377 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Accordingly, under this interpretation of the law, Harris County Precinct Four Constable Mark Herman cannot be considered Harris County's final policy maker as to law enforcement for purposes of county liability under Section 1983. This also means that Harris County can avoid liability when Harris County deputy constables violate Harris County citizens' constitutional rights. This legal loophole has a disproportionate adverse effect on Harris County residents, because Harris County is the only county in Texas that employs nearly eighteen-hundred sworn deputy constables, hundreds more than any other county in the state. As such, when a Harris County resident's constitutional rights are violated by a deputy constable, they are left without recourse to a legal remedy.

**ii.** ***This Court Should Take the Opportunity to Close the Legal Loophole***

82.     That the legal loophole exists is common knowledge. A Houston Chronicle investigation entitled "Unchecked Forces" published in March 2024 has documented the loophole's existence and its consequences. Harris County leaders are also aware of it. Harris County Commissioner Rodney Ellis said he wants to ask Harris County Attorney Christian Menefee for his thoughts about the loophole, which the Harris County Attorney's Office continues to use. Fred Keys, a retired deputy manager of litigation for the Harris County Attorney remarked, "you'd be foolish to want to do away with a law that lets you win every time," yet he also conceded that a legal maneuver that effectively excluded a large active and growing law enforcement sector from accountability was increasingly hard to justify. "To be immune from suit under any circumstances doesn't make any sense," Keys said. Appellate judges back in the 1980s decided the constables can't be sued as individual entities, because they're part of the county – but paradoxically, the county can't be held liable for their conduct either, because constables don't make policies countywide.

83.     To the extent the citizens of Harris County elected Harris County Precinct Four Constable Mark Herman, and he has pursued his duties in an unconstitutional manner, the citizens of Harris County are required by Section 1983 to bear the burden of their mistake. Accordingly, the law should be changed such that a constable is a final policy maker for law enforcement for purposes of county liability under Section 1983.

### COUNT THREE – 42 U.S.C. § 1983
### SUPERVISOR LIABILITY
*Failure to Adequately Train and Supervise*
(Defendant Herman)

84.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

85.      In order to establish supervisor liability for constitutional violations committed by subordinate employees, a Plaintiff must show, as relevant here, that the supervising personnel was

"personally involved" in the alleged constitutional violations. *Turner v. Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017); *Peha v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

86.     To show personal involvement, the supervisor must know about the violation and personally direct the violation, facilitate it, approve it, condone it, turn a blind eye to it for fear of what he might see, or acquiesce in its continuance. *Turner*, 848 F.3d at 696 & n.88 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).

87.     Defendant Herman implemented and/or failed to implement the aforementioned policies, training, and supervision, which were the moving force that caused Mr. Fontenot's constitutional injuries.

88.     As a direct and proximate result of the Defendant Herman's conduct, Defendant Unknown Deputy No. 1 took Mr. Fontenot's liberty and life without due process of law.

### COUNT FOUR – TEXAS WRONGFUL DEATH AND SURVIVIAL ACTION

89.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

90.     Plaintiff files this his wrongful death and survival action against Defendants pursuant to the Texas Wrongful Death Statute and Texas Survivorship Statute and asserts that Mr. Fontenot's death was the result of Defendants' acts and omissions.

### DAMAGES

91.     Plaintiff seeks all damages allowed by law as a result of the aforementioned conduct forming the basis for each of his claims. Plaintiff requests damages within the jurisdictional limits of the Court.

92.     Upon the trial of this cause, it will be shown that Mr. Fontenot sustained serious, permanent injuries, and ultimately death, and Plaintiff incurred serious damages.

93.     The damages sustained by Mr. Fontenot and the Plaintiff were proximately caused by the Defendants as set forth herein.

94.     Plaintiff respectfully requests the Court and a Jury to determine the amount of losses Mr. Fontenot and the Plaintiff have incurred in the past and will incur in the future.

95.     Certain damages elements are provided by law to which the Plaintiff is entitled to have the Jury separately consider in this case to determine the sum of money that will fairly and reasonably compensate the Plaintiff.

96.     Plaintiff is further entitled to reasonable attorneys' fees and costs in pursuing this matter, and any other reasonable and necessary damages as allowed by 42 U.S.C. 1988.

## SPOILATION INSTRUCTION

97.     Plaintiff has requested and demanded that Defendants preserve and maintain all evidence pertaining to any claim of defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom.

98.     Failure to maintain such items shall constitute a "spoliation" of the evidence.

## REQUEST FOR RELIEF

99.     Plaintiff seeks judgment in his favor and against the Defendants, jointly and severally, ordering them to pay all damages recoverable under the law, including the following:

Compensatory damages;

Loss of enjoyment of life;

Emotional pain;

Physical pain and suffering;

Physical impairment;

Mental anguish;

Loss of the society, association and companionship of family;

Loss of the parent child relationship;

Deprivation of legal rights;

Loss of earning capacity;

Disfigurement;

Death;

Punitive damages;

Pre-judgment interest;

Post-judgment interest;

Costs of suit and fees as allowable by law;

Attorneys' fees under 42 U.S.C. § 1988;

Expert fees under 42 U.S.C. § 1988, and

Any other relief as is deemed just and proper.

## JURY TRIAL

100.    Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER

101.    WHEREFORE, Plaintiff respectfully prays that Defendants be summoned to appear and

answer herein, and that upon a final hearing of this cause, that judgment be entered for the Plaintiff

and against Defendants for all damages requested herein, together with pre-judgment and post-

judgment interest at the maximum rate allowed by law, attorneys' fees, costs of court and such

other and further relief to which Plaintiffs may justly entitled at law or in equity.

Respectfully submitted,

By:    /s/ *Issa Paul Tannous*
**ISSA PAUL TANNOUS**
Texas Bar No. 24048829
Federal Id. No.: 3621802
4900 Fournace Place, Suite 520
Bellaire, Texas 77401
Tel. (713) 485-5901
Fax. (832) 201-9145
issa@iptannouslaw.com
**ATTORNEY FOR PLAINTIFF**